3-0909-87 Kyle Danhausen et al. Kellen Gregory Beck v. Thomas Ewert Emily Joseph You're good. You may proceed. Good morning, and may it please the court and good morning to counsel as well. This case involves a $26 million settlement fund for paying property damage claims in related matters resulting from a shell pipeline spill. That spill that gave rise to the settlement fund occurred on the property of the appellant that claimed the Martha J. Danhausen estate when 100,000 gallons of gasoline suddenly appeared in the middle of their corn and soybean fields. Despite the fact that the property of the Danhausen estate was at the epicenter of this spill, the award made by the settlement administrator to the estate from that fund was only $120,489. That amounts to four-tenths of one percent of the settlement fund. Such a minuscule award is hardly appropriate when you consider the fact that the property of the Danhausen estate had 100 percent of the pipeline spill occur on it. We're faced with this sort of result because the settlement administrator and then the trial court did not determine the damages to the Danhausen estate based on an individual basis as is required by applicable law, even though this is a class action proceeding. Class counsel would have you believe that that's just part of the way it works in a class action lawsuit. Everyone's damages have to be computed in accordance with some sort of strict formula. However, such a strict formulaic payout is not only contrary to law, but it's also contrary to what the settlement administrator himself said that he did in this particular case. First, with regard to the law, I direct your attention to the Medrick cage, which is cited in our brief. That's another class action lawsuit. That class action involved an underground storage tank that leaked. Our case involved a pipeline that spilled, very, very similar. In the Medrick case, the United States Court of Appeals for the Seventh Circuit, applying Illinois law, indicated that the individual claims in that matter need to be adjudicated on a case-by-case basis. It said that the particular harm suffered by particular class members whose homes are in the area of contamination must be decided class member by class member and not in accordance with some sort of strict formula. The same thing would obviously be true for the case at hand here. In fact, when this case was in federal court in New York as part of the MTB litigation, the federal court, in remanding it back to the Circuit Court of Kankakee County, explicitly found that that individual claim handling procedure outlined in the Medrick case I just mentioned was to be both persuasive and controlling for this case. The settlement administrator claimed that he would make the decisions based upon any kind of applicable law and any kind of individual special circumstances that there would be. For example, when people got the settlement agreement, they were able to see that on the website, when they got a claim form, it told them right in the claim form that most of the residents in the core area have similar claims. They will be compensated equally from the fund. Some have special circumstances or out-of-pocket expenses that would justify additional compensation. If you believe, and this is the claim form, you have suffered any harm that is materially different than any of the other residences in the core area, please attach a statement and any documents explaining your situation. That's precisely what the Danhousen Estate did. We attached to our claim form a detail of our damages, including a specialized appraisal of our own piece of property. Let me ask you a quick question about that appraisal, because I live in a rural area. Farmground and Eric Floyd County go for $10,000 an acre. Yes, it does. This area, as the appraisal report indicated there, this area is zoned, the area of the Danhousen Estate is zoned R1 residential. It's under the Kankakee County Zoning Ordinance. It's very ripe for development. It has a lot of farmettes, a lot of wooded areas, tracks, including the Danhousen Estate, and it very easily goes for $10,000 an acre. It's a very desirable piece of property, particularly at the time this all happened, and the economy has kind of put a slowdown on some of the residential development at the moment, obviously, but very clearly would go for easily that kind of value. Potential members of the class had a right to rely on this in deciding whether they should opt out or not, as did the Danhousen Estate. If they were to be, if they had something special, if their values were different, if the spill happened on their land, then they need different treatment. The settlement administrator represented in his report, as you look in the materials there, that he looked at the unique characteristics of the parcels of real estate. He said he looked at the highest and best use of those parcels of real estate. He said he looked at the highest cash value of those pieces of real estate. He said he looked at special circumstances that would justify additional compensation. He said he looked at whether the claim would have unique and different damages. However, in reviewing and calculating the Danhousen Estate award, he ignored all of that and did none of that. He just used a simple formula that he came up and said, all the land in Limestone Township, if it's farmland, it's got to be worth X amount of dollars, and just used that formula without any differentiation, the fact that here's where the spill happened, here's a property that's zoned R1, here's a property that has woods, here's a property that's appropriate for residential development. To support its claim, the Danhousen Estate submitted that appraisal we just discussed here. That appraisal indicated and has attached to it the zoning map of Kankakee County, and it says in the text there that this property is zoned R1 residential. That's the highest and best use. That's the zoning classification information the settlement administrator said he was looking at, but chose to ignore. The Danhousen property is contiguous to the village of Limestone, which makes it particularly appropriate for residential development. There's about, the appraisal also pointed out the fact that obviously there was a huge diminution in value of this property right around the area of the spill. We have 40 acres that's been at the spill site for some 20 years now, under remediation, intensive, all kinds of equipment and everything else there. He also pointed out that the spill area limits access to the various parts of the farm, makes it hard to develop anything for residential out there. In fact, in your brief that you attached as an appendix, there's this aerial photo from the appraisal that shows, here's where the spill happens, this cleanup area's in red here, here's our farm. It cuts off the back part of the farm, you've got to go all around it, even for farming it's not easy to do. He pointed out all of those special circumstances in the appraisal as he was going through this. Based upon that individualized analysis, he looked at every piece of the Danhausen farm. Some of those pieces he found wouldn't have much impact on the spill, some he thought had a huge impact on the spill. His conclusion was that the diminution in value to the Danhausen estate was $1,172,300. There is absolutely no other evidence in the record other than that as to the diminution in value of the Danhausen estate property. Well, just because there's only one opinion like that out there, doesn't mean the finder of fact has to buy into that opinion in any given case. The finder of fact should have made some findings or followed that opinion and said, I don't believe it's zone R1 or it's zone R1, but I don't think so. What happened here, we just got swept along in the blanket format, and the case told us, I mean the law tells us, we've got to look at this on an individualized case basis. It's class action, yeah, but that's the liability issues which have been determined here by the settlement. We're looking at claimant by claimant. We need to be able to look at that. If somebody's got special circumstances, they're entitled to submit evidence as to that, and he needs to be able to look at that. He can obviously weigh that evidence, but if you look at that evidence, I think it's compelling. There's just nothing else he's got on the other side that says anything different as to that. In fact, the appraisal that the settlement administrator claims he relies on does not mention a value of farmland at all. You can read it. It's that thick. You can read every page of it. There's not one word of farmland is worth in Limestone Township or particularly the Danhausen Estate where it fills. So I don't know how, in the face of that, you can say that that's not clearly against the manifest weight of the evidence. The same thing is true with the way the settlement administrator handled our claim for nuisance and interference with quiet enjoyment. Here he also ignored the special circumstances that the Danhausen Estate had. Our claim form, particularly the supplement to it, recites the following facts here. We've got 100,000 gallons of gasoline that spilled on our property. We have 450 feet by 50 feet of liquid that was out there after the spill. Nobody else had that. We've transformed what was a farm and residential property into a 40-acre industrial site complete with metal buildings and pumps and trucks and heavy equipment and monitoring wells and all this kind of business. But you're getting paid for that? It's being rented from us, just a still area, but not the rest of the farm. How do you know it's got to use? It's not useless property. Somebody's paying you to use that in that capacity, right? They're paying us right now to do it, but whenever they decide they're quit and they ride off into the sunset, we've got a piece of property that we can advertise for sale as being, oh, here's the epicenter of the spill. Do you want to buy our piece of land? You know, that kind of thing. So that's exactly what's going to happen to us at some point. We don't know when that point is. They've been going at this 20 years now. But they could cut off our rental payments any time. They could pull out any time and say, we're done, and we're left with what's left. How many years has Shell been involved? 20 years. It's been since 1988, a little over 20 at this point in time. We still have on our property, because of this cleanup effort, the occasional odor of gasoline. We still have a machine of gasoline on some water because they're pumping it out of the bedrock and processing it or whatever else they do to that sort of thing. We've got to grab a road on our farm we didn't have before. We've got a creek running from it we didn't have before. At one point they were pumping 100,000 gallons of water out of our farm. They've got 80 trucks in and out, all this sort of thing. But if you're going to talk about that, and I saw there was quite a bit of discussion at the trial court level, if you're going to talk about the gravel road they put on there, what have they been paying a year of rent? In other words, you talk about the downside of this operation, what's the upside? How much Shell Oil pay y'all to put that gravel road there? Well, this is not in evidence in the case, but they're going to use approximately $50,000 a year for the 40 acres. There is no evidence on the case? There's no evidence on that in the case, that's correct. Despite the fact that this evidence that we submitted was uncontested as to the impact on the Danhausen property, the settlement administrator awarded just $11,000 for nuisance and quiet enjoyment with our property. Again, based on this formellic approach, ignoring what's going on in the whole situation. So he did not look at the individualized things that he needed to look at in analyzing our claim. Because we had special circumstances, we can't be treated by everybody else under applicable law, and under the old formats that everybody bought into the class action with it. So you've got special circumstances, we're going to listen to them, we're going to deal with them. So the awards for the settlement administrator for diminution in value are clearly against the manifest way of the evidence. Same thing with the award for the interference with quiet enjoyment. The opposite result is compellingly evident, plain, and indisputable. Same thing with what the trial court did when it affirmed that decision. It has to be reversed. There just can't be, you can't tell me that four-tenths of 1% compensates this claimant adequately when all of this spill happened on their property. When we have property being compensated on the same formula three miles away that doesn't even probably know a spill happened except they happen to read it in the newspaper, totally unaffected by this. It needs to be done on an individualized basis. When you look at the evidence, what the evidence shows, based on our appraisal, is that there's been a diminution in value of $1,172,300. We are asking also for interference with quiet enjoyment of three times that amount as a measure of that kind of compensation, which is $3,516,900. I saw how you got there, but what's the support for that, the treble damages number? There's no magic formula for this. I looked in vain for one. I could not find any. My best judgment, based on applicable law, is triple damages are used in a lot of cases. That's a measure that we can use in this particular case, and that's what we recommend this court do. A lot of times that's by statute, though. And some are assessed by statute. That's correct, yeah. That's a statutory formula. That's exactly right, yeah. There is, so there's a statutory formula as well. But there's no other way to measure this. How do you measure that kind of thing? It's an inexact thing, and all we can say is this is the best way we can measure it. We want to tie it to something. Personal injury cases are typically analyzed on so many times specials and things like that, and that's the same sort of thing here. We're going to look at the diminution in property value multiplied by three and come to some measure of what it is. That's not a lot of money, considering the fact that there's $26 million out there that's to be awarded to claimants. That's not a lot of money when the spill all happened in our land. It's not a lot of money when our state has the brunt of this spill. Mr. Duckett, at least with the issue of the quiet enjoyment, it seems to me that you tied the hands of the administrator to an extent by refusing to give information that was asked about what you were being paid in the way of rent. Didn't you, in effect, reduce him to the point of having to use a formula? No. There was never any formal request made for that information. There was no letter from him. There was no request from him. He didn't get our claim form and say, hey, I see you got this in here. What do you got here? You know, that kind of thing. There was none of this back and forth on this. It was just, here's your award. And so we didn't have that. That was not explicitly asked of us. We did not volunteer that information. Here's the important thing to remember. It's not really relevant to our claim. Here's why. If you look at the claim form and the claim damage calculation sheets, there is an element of damage we could have made a claim form for loss of use of our property. We did not make a claim for loss of use. The reason was we were getting paid by shell for loss of use. That was compensating for us. So that's the reason that even had we furnished that number, the settlement administrator should not have made any difference to our claim, number one. And secondly, the whole formula didn't say you get whatever you get is reduced by whatever you previously received from shell. There are other people that had water systems put into subdivisions there that didn't have their awards reduced accordingly as well. So it was never formally asked of us, number one. And secondly, it was not relevant either because it goes to the loss of use compensation element. We're not asking for anything in that category. So we ask, therefore, that you reverse the decisions of the trial court and the settlement administrator and award for these elements of damage, $1,172,300 for property damage based upon evidence of the appraisal, $3,516,900 for interference with quiet enjoyment and nuisance value, and then the other things as part of the award, too, the normal things that are really not in dispute here like bottled water and the things that are not at issue. So we respectfully ask that you enter an order accordingly. Thank you. Thank you, Counsel. Counsel, you may proceed. Here's the court. Counsel. My name is Joe Yergin. This case arose in my office in 2001 when a woman in a rural area came into my office with a contaminated well. I'm going to jump right into the arguments because of the time. But in essence, a fund was created as a result of this. Counsel said it was $26 million. Actually, it was $46 million when you count separate and apart from the cash the subject of water lines. The area, it was a small definitive area in our county. Our county has got 100,000 people. But we're proud of the settlement. We're proud of what the settlement administrator and the trial judge did in this case. We started with a settlement after the settlement came about. The settlement agreement included criteria as to what the settlement administrator was going to do. It was worked out with both class counsel and him. He was then shown to the court. He was then given the authority to make disbursements. Class members, and there were approximately 1,400 of them, were given notice of the settlement agreement. They were given an opportunity to opt in or opt out, several opt out. The Danhausens were one of the 1,400 that chose to opt in. Later, when a hearing arose before the trial court concerning objections to the disbursements by the settlement administrator, again, that procedure was outlined by Judge Lispel. But at that point, counsel for the Danhausens agreed and approved the settlement, the outline for the procedure that the court was going to follow. Once they opted in, once the claimant opted in, they had certain responsibility, certain responsibility. Every claimant, every one of the 1,400 claimants received a claim form, a four-page claim form. And on the third page of the claim form, documents were requested, supporting documents, that they felt that there were special circumstances about their particular property. They were to provide the settlement administrator with the form, various documents. It was their burden to present the claim and support it with documents. And in this particular case, the record will show that the Danhausens even got several extensions of time to complete their material and to provide it to the settlement administrator. What did they give the settlement administrator in this case? And keep in mind, their claim is over $4 million. They gave them a report from a real estate agent by the name of Hanson, who was not a licensed appraiser, who was a real estate agent. There was no statement of tillable acres or acreage. There was no statement regarding the income from the land or the farming from the tillable acreage or from harvesting woodlands. The statement did have some comparable sales, but they were not identified with any specificity. The appraisal, according to the settlement administrator, violated the unit rule. Certainly, the report was considered by the settlement administrator in the case, but its weight was up, like the earlier case that you just had here. The counsel talked about weight. The weight of that report was up to the settlement administrator, and he did not find it convincing or credible. That's in the record. He was entitled to consider that and to consider the credibility and the weight. They argued that the majority of the farm property was zoned residential one and that the best use was residential. But even the trial judge pointed out that that was inaccurate because they were paying property taxes, farmland. They gave the rental. There was rental property, and it was being rented, which I'm going to get to. But there was no value, and they looked at that as having no value, even though the value can be calculated by the return rate. Knowing the rental return was important for determining the value of the rental tract. Also, as the court pointed out, there was never any subdivision attempt to be platted out or any serious effort made to develop the property. That was what the trial judge pointed out. In short, they were asking for much more money than the property was worth. I think they had three. Without the spill, their expert estimated $3,267,000.  They asked for $1,172,300 for diminution in value of the real estate. Then they wanted another $3,005,000 plus for nuisance and loss of enjoyment. And they wanted all that based on the Hansen report, which was discredited, which the settlement administrator did not find credible, and some photos and a three-page assertion by their claimant. What didn't they give the settlement administrator? What they didn't give the settlement administrator was supporting documents about the income they were receiving from Shell. And there was never a dispute that they were getting some income, but it was just never disclosed. The settlement administrator, as the court record shows, advised that he tried to work it out with the Danhausen attorney to get information to process the claim. He made a number of requests, both in writing and in phone calls. He processed the claim with all the information that they gave him. He asked both the attorney for Danhausen and the attorney for Shell about the payments that Shell was making, but the amount was not disclosed. As the court stated, Judge Luzfeld, it was incongruous to argue that the property was useless and worthless when Shell was paying thousands of dollars to rent it. The court, the trial judge, noted that property that generates income is not worthless. It's true there was no court order ever entered requiring the Danhausens to submit it, but, again, it was their burden. It was certainly clear and plain to everyone that that information was relevant. They argued, for example, that the Danhausens argued they couldn't put houses on it and that that property had a significant diminution. But then the court responded that even if they had subdivided the property and put houses on it, they would have made probably less than what they were making from rent. Similarly is their argument regarding loss of enjoyment and nuisance. Now, keep in mind there were other neighbors there in close proximity that also had some spill and gas spill on their property. They suffered along with everyone in the immediate area. They had gas floating on their land, too. They were inconvenienced like the Danhausens. But, in short, the Danhausens didn't really provide enough evidence to the settlement administrators to show that they suffered something so far differently from the other neighbors. All the claimants, there was Kaur and there was Albert, but all of the claimants in the Kaur suffered a nuisance. And also they had a general drop in the market value of their real estate. And that was, again, in a defined area. And with regard to the nuisance with the trucks, for example, both the settlement administrator and the trial judge felt that part of that compensation for the trucks going in and out for use was also being provided by Shell in the form of rent. But, again, it was tough to evaluate when you don't have those figures. So under these circumstances, under these circumstances, if counsel wants to argue manifest weight of the evidence, can you really say that the fact finders, the settlement administrator, and the trial judge were unreasonable, unfair, or arbitrary in that that was against the manifest weight of the evidence? One of the things we would like to emphasize is this. One of the main points we feel is that we feel that deference should be made to the fact finders. Now, in this case, there were two levels of fact finders. We had both the settlement administrator and the trial judge, both of whom agreed that the Danhausens were fairly compensated. And, by the way, these fact finders are not the typical fact finders that you might find with an industrial commission case or you have non-lawyers even at the commission level and down below as arbitrators. We had a – the settlement administrator was a trial judge, retired, who headed the civil division in Will County, sitting in the back of the courtroom. And then we had our own. We had our own circuit judge, Judge Lutzfeld. And so, at the very least, the Danhausens' refusal to answer the questions or to disclose information about compensation from Shell, at the very least, was an equitable factor. An equitable factor at a minimum that the fact finders could properly account for in the distribution decision. And, certainly, their exercise of equitable discretion is entitled, at least from our side of the table, to particular deference. The Danhausens, of course, claim that they should be treated differently. In response to that, again, as the court pointed out to them, if they wanted special damages, they didn't have to opt in. They could have stayed out. They could have opted out and taken on their own case. If they didn't like the formulaic approach of the class action that was laid out, and if they felt that maybe something was more advantageous to them, they could have opted out. The trial judge approved the approach of the settlement administrator. He approved the settlement agreement. They did not make any objection to it. We pointed out in our brief also that the controversy here is not necessarily, is not simply between the Danhausens and the court and the settlement administrator. Because you also have approximately 1,400 claimants, and certainly whatever is done here with claims impacts on the rest of the people. To come in and ask for a substantial portion of the settlement fund certainly impacts on their interests also. They argue, for example, that the settlement agreement, that there were no guidelines for compensation for nuisance and interference with quiet enjoyment. Yet when they had the opportunity to object, they did not. They accepted it. They opted in. They accepted the benefits. But now they're attacking, so to speak, the way it was handled. Singling out individual claimants for special treatment, from our point of view, would depart from the equitable nature of the proceedings. Again, if they wanted special treatment, I think the situation to do that is not to come into a class action with distributions, but to do it on your own. They also argue that it's inequitable. We say that based on what they submitted, that it was totally fair. And let me just make a few other points, a few other points that I would throw out to the court. The settlement agreement, if you look at it, there's a certain provision in there that when you opt in and when you agree to accept the distribution, you are, in effect, releasing your claim against Shell. That's part of what the settlement agreement provided. But in this case, they, in effect, have a quote-unquote side agreement that they didn't want to disclose. It limited Shell's exposure, so to speak. They opt in, they get what they can from the fund, and then they got some kind of side agreement undisclosed, perhaps, that will then pay them perhaps something in arbitration. Who knows? But the point is... It's speculation, though. It's speculation. It was never discussed. But there is a smoking gun document that talks about a side agreement, which is Appendix A-9, that we've attached to our brief. But in any event, I just point that out. That's something that the other class members do not have. That's the last two minutes. Okay. We feel that the class actions and the distribution of funds in this kind of a settlement, it is, in effect, a compromise of a dispute. Class action settlements should be fundamentally uniform as a standard of fairness in distributing funds. It was really never designed, from our point of view, for special treatment for one claimant. And that's what was done here. If the court were to reverse what was done down below, you would, in effect, be substituting your own perhaps better formula for what the settlement administrator and the trial court did in this case. We still have over $11 million in an account to disperse. And certainly, the annhousings are one of the claimants that will participate in that. In any event, we respectfully ask that you affirm the trial court what they did. Thank you. Thank you, counsel. Counsel. We do ask that you give deference to the settlement administrator's decision and the trial court's decision. But what you need to also do is to hold them to the standard that they represented that they were going to use in this case. The law tells them what they need to do. The law says that they need to look at, even though it's a class action, the Bedrick case says they need to look at this on an individualized basis as far as claims are concerned. They represented, the settlement administrator represented that he did that. He didn't do it. They represented, when you decided whether to opt out or not, that if you had a special circumstance, you could submit information about it. They would consider that evidence and apply specialized circumstances to it. They did not do it. All they did is go by a strict formula. So all we're asking this court is to require that the trial court and the settlement administrator follow the law and follow what they agreed to do when people signed into this class action lawsuit in the first place, which is to consider those claims on an individualized basis. It's for that reason we ask that it be reversed and the board has requested it. Let me, let me, I've got a couple. Just hypothetically, and I know these numbers are a lot larger, but if somebody's got a thousand gallons of gasoline dumped on his ground, does that mean he has got ten times more damage than somebody that has a hundred gallons of gasoline dumped on his ground? I mean, does math work that way? I mean, can you draw that conclusion? To a degree you can. I mean, it's, the situation is the, when you have that kind of a size of a spill, it's obviously going to have more impact because they've been 20 years trying to clean it up, for one thing. There's nobody, they're not remediating anybody else's land, by the way. There's absolutely nobody else other than Dan Elton State that's got remediation going on to it. And so when you do that, it does, you know, people know that it's going to affect that value. If you look at our appraisal, he was very careful in how he did this. We have a little piece of our farm that's like a 40 that's off a little bit, maybe a half mile away or something. He said no diminution in value in that, our appraiser did. He was very careful in what he did. But when he looked at where this spill happened, and the way it cuts off our farm, and the way it would cut this off our residential development, when it's adjacent to the village of Limestone, when it's zoned R1 already, he said it's got to have a diminution in value in this thing. And that's what we're trying to point out, and that's what's been ignored in this case. And another, but I think it's important, what do you say our standard review is here? The standard review is against the manifest way of the evidence. Doesn't the case law say it's abuse of discretion, that the allocation of class settlement funds is discretionary? No, I don't agree with that. There's no case law that I can find that says that. If you look, I did cite in our brief, I thought it was very good, you're probably familiar with this, but an article in the Southern Illinois University Law Journal that goes over standards review in the utmost detail, even some empirical data in there. Did you read the Illinois Supreme Court's case of People v. Equity Funding Life Insurance? I didn't look at that case. If that exists, I'm sure it exists, but People v. Equity. It does. And what does it say? If you don't mind. 61 Illinois 2nd 303. Okay. It talks about the discretion and allocations, I recall. My understanding of the law, and I've not read that case, my understanding of the law is that abuse of discretion applies to procedural matters by the trial court, such as whether it gives somebody a continuance or not, whether to join plaintiffs or parties to a case, whether to remove them from cases, those kinds of things. It's more of a procedural thing that's addressed by the abuse of discretion standard. Here we need to look at the manifest way of the evidence standard. You really, you look at the case, the trial court's order was that we follow the administrative review law. When you look at the administrative review law, what you do is, it's the decision we're looking at is the settlement administrator's decision, not the trial court's decision, number one. And secondly, that's where you use the manifest way of the evidence. Because there's no abuse of discretion standard in the administrative law context at all. This is a statutory proceeding, isn't it? Pardon? This is a statutory transaction proceeding, right? This one is, yes. Yeah. The statute, the class action statute is very short in Illinois. It doesn't have a lot of detail in it. It has nothing about how to handle claims on an individual basis. It doesn't say anything about standard of review. It's just for convenience purposes, and we agree with this, that we said we would treat this as if it was an administrative decision, and we agreed to do that. But that gets you to the, against the manifest way to the evidence standard, not abuse of discretion, by my thinking. Counsel, that's my minute. Thank you. The court will take a brief recess for a panel change. We'll take this case under advisement and render a decision with dispatch.